CASE NO. 9:21-CV-81750

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SAFS, INC.,

Appellant,

v.

GEORGE D. DAVIS,

Appellee.

On appeal from the United States Bankruptcy Court for the Southern District of
Florida, West Palm Beach Division,
Lower Tribunal (Bankruptcy Case) Case No. 20-17930-EPK
Lower Tribunal (Adversary Proceeding) Adv. Pro. No. 9:20-ap-01384-EPK

## APPELLANT'S INITIAL BRIEF

**DAY PITNEY LLP**

Andrew R. Ingalls
Florida Bar No. 112558
aingalls@daypitney.com
396 Alhambra Circle
North Tower – 14th Floor
Miami, Florida  33134
Tel: (305) 373-4000
Fax: (305) 373-4099

Joshua W. Cohen
Admitted *Pro Hac Vice*
jwcohen@daypitney.com
195 Church Street – 15th Floor
New Haven, CT 06510
Tel: (203) 752-5000
Fax: (203) 399-5854

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Bankr. P. 8012, SAFS is a nongovernmental corporate party in this action. SAFS is not owned by any parent corporation, and no publicly held corporations own 10% or more of SAFS's stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. iv

STATEMENT OF ISSUES AND STANDARD OF REVIEW ................................ iv

REQUEST FOR ORAL ARGUMENT ............................................................ v

STATEMENT OF THE CASE AND FACTS .................................................... 1

  I.   The Parties ............................................................................................ 1

  II.  Statement of the Facts ........................................................................... 1

       A.   The Dealership .............................................................................. 1

       B.   The Lending Relationship ............................................................. 1

       C.   The Sham Floor Plan Requests and Invoices ................................. 3

       D.   The Sales Out of Trust ................................................................... 4

       E.   Davis's Participation in Auto House's Schemes ............................ 5

       F.   Davis's Failure to Maintain Auto House's Business Records ........... 6

       G.   The Connecticut Action ................................................................. 7

       H.   The Adversary Proceeding ............................................................. 9

          1.   Davis's Motion for Summary Judgment .................................. 10

          2.   SAFS's Response to Davis's Motion for Summary Judgment ...... 10

          3.   Davis's Reply in Further Support of Summary Judgment ............. 12

          4.   The Bankruptcy Court Ruling ................................................ 12

ARGUMENT ........................................................................................... 14

  I.   The Bankruptcy Court erred in applying collateral estoppel to bar
       SAFS's §523(a)(6) claim ........................................................................ 14

  II.  The Bankruptcy Court erred in granting summary judgment as to
       SAFS's §727(a)(3) claim based on findings contradicted by the record ...... 20

CONCLUSION ......................................................................................... 28

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Askins*,
No. 8:18-BK-08833-RCT, 2020 WL 5745648 (M.D. Fla. July 24, 2020)........ 21

*Barreto v. Davie Marketplace, LLC*,
331 F. App'x 672 (11th Cir. 2009) ........................................................................v

*In re Bianca*,
No. 19-16935, 2020 WL 1181362 (S.D. Fla. Mar. 10, 2020) .............. 20, 26, 28

*Chapman v. AI Transport*,
229 F.3d 1012 (11th Cir. 2000) ........................................................................ 26

*Corcoran v. Dep't of Soc. Servs.*,
859 A.2d 533 (Conn. 2004) .............................................................................. 15

*In re Forbes*,
186 B.R. 764 (S.D. Fla. 1995) ......................................................................... 19

*Ford Motor Credit Co. v. Owens*,
807 F.2d 1556 (11th Cir. 1987) ................................................ 15, 16, 17, 18, 19

*Gladysz v. Planning & Zoning Commission*,
773 A.2d 300 (Conn. 2001) .............................................................................. 20

*In re Harris*,
3 F.4th 1339 (11th Cir. 2021) ...........................................................................v

*In re Levin*,
434 B.R. 910 (S.D. Fla. 2010) ......................................................................... 15

*In re Lorenzo*,
606 F. App'x 548 (11th Cir. 2015) ............................................................. 23, 24

*In re Monson*,
661 F. App'x 675 (11th Cir. 2016) ................................................................... 16

*In re Moore*,
559 B.R. 243 (M.D. Fla. 2016) ................................................................... 21, 24

*In re Protos*,
   322 F. App'x 930 (11th Cir. 2009) ..................................................... 21

*Wanamaker v. Town of Westport Bd. of Educ.*,
   11 F. Supp. 3d 51 (D. Conn. 2014) .................................................... 14

*Westlake Flooring Co., LLC v. Staggs*,
   No. 5:17-CV-1722-KOB, 2018 WL 3752383 (N.D. Ala. Aug. 8, 2018).......... 16

*In re Wizenberg*,
   849 F. App'x 775 (11th Cir. 2021) ..................................................... 16

**Statutes**

11 U.S.C. §727 ....................................................................... 22, 26, 28

## STATEMENT OF JURISDICTION

This is an appeal taken from the Order Granting Defendant's Motion for Summary Judgment (the "Order") [ECF No. 51] and the corresponding Final Judgment (the "Final Judgment") [ECF No. 52], both entered in the adversary proceeding styled *SAFS, Inc. v. Davis (In re Davis)*, Adv. Pro. No. 9:20-ap-01784-EPK (the "Adversary Proceeding") by the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court") on September 2, 2021. The Bankruptcy Court's jurisdiction over the Adversary Proceeding is based upon 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Court's jurisdiction is predicated upon 28 U.S.C. § 158(a). SAFS filed its Notice of Appeal and Statement of Election with the Bankruptcy Court on September 16, 2021, making this appeal timely pursuant to Fed. R. Bankr. P. 8002(a)(1).

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

1.      Did the Bankruptcy Court err when it granted Appellee George Davis's Motion for Summary Judgment as to Count III of the Complaint and entered the corresponding Final Judgment denying Appellant SAFS, Inc.'s 11 U.S.C. §523(a)(6) claim by applying the doctrine of collateral estoppel to preclude Appellant SAFS, Inc.'s assertion that the willful and malicious injury inflicted upon SAFS by Auto House of Southington could be imputed to Appellee George

iv

Davis? This question of law is subject to plenary or *de novo* review. *In re Harris*, 3 F. 4th 1339, 1343 (11th Cir. 2021); *see Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009).

2.      Did the Bankruptcy Court err when it granted Appellee George Davis's Motion for Summary Judgment as to Count IV of the Complaint and entered the corresponding Final Judgment denying Appellant SAFS, Inc.'s 11 U.S.C. §727(a)(3) claim based on factual findings contradicted by the record and on an erroneous application of the doctrine of collateral estoppel? This question of law is subject to plenary or *de novo* review. *In re Harris*, 3 F. 4th 1339, 1343 (11th Cir. 2021); *see Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009).

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Fed. R. Bank. P. 8019 and S.D. Fla. L.R. 87.4(g), Appellant SAFS, Inc. respectfully requests that the Court schedule oral argument in order to afford Appellant SAFS, Inc. further opportunity to expand upon or clarify any of the issues raised herein.

## STATEMENT OF THE CASE AND FACTS

### I.      The Parties

Throughout this Brief, Appellant, SAFS, Inc. will be referred to as "SAFS."

Appellee, George D. Davis, will be referred to as "Davis." Davis is also the debtor

in *In re Davis*, Case No. 20-17930-EPK.

### II.     Statement of the Facts

#### A.      The Dealership.

At all relevant times, Auto House of Southington, LLC ("Auto House")

operated a used car dealership in Southington, Connecticut. (R. 8-4, 106 ¶ 3).

Davis was the Managing Member and sole owner of Auto House. (R. 8-4, at 106-

107 ¶¶ 3-4.). Davis managed the day-to-day operations of Auto House and

supervised its employees. (R. 8-4, 221:8-17; 226:1-4; 227:19-25). Davis oversaw

and approved the acquisition of Auto House's vehicle inventory, the financing of

such inventory, and the ultimate disposition of such inventory.  (R. 8-4, 147:17-20;

151:11-17; 226:2-5; 227:4-25). As described further below, SAFS provided

financing to Auto House for the purchase of vehicle inventory. (R. 8-4, 107 ¶ 6).

#### B.      The Lending Relationship.

On or about September 13, 2006, SAFS, as lender, entered into a Fee

Agreement with Auto House as borrower (the "Fee Agreement"), for the purposes

of providing certain financing and services to Auto House with regard to the

purchase of motor vehicles and/or obtaining, preparing for sale and holding for sale such motor vehicles. (R. 8-4, 107 ¶ 6). By Security Agreement dated September 13, 2006 (the "Security Agreement"), Auto House granted SAFS a security interest in, among other things, all used vehicles purchased by Auto House and financed by SAFS (the "Vehicle Collateral"), and all proceeds of the Vehicle Collateral, including the proceeds of insurance. (R. 8-4, 107 ¶ 7). Under both the Fee Agreement and the Security Agreement, Auto House had an obligation immediately to pay to SAFS the proceeds from any sale of Vehicle Collateral. (R. 8-4, 17 ¶ 3; R. 8-4, 19 ¶ 3(e)).

In furtherance of the Fee Agreement and the Security Agreement, SAFS, as lender, and Auto House, as borrower, entered into a series of promissory notes evidencing amounts loaned by SAFS to Auto House under the Fee Agreement (the "Notes"). (R. 8-4, 107 ¶ 9). Davis executed and delivered to SAFS a Letter of Guarantee (the "Guarantee" and, together with the Fee Agreement, the Security Agreement and the Notes, the "Loan Documents") dated September 13, 2006, wherein he "unconditionally guarantee[d] to [SAFS] full and prompt payment at maturity, including any accelerated maturity, of any and all liabilities owed to [SAFS] by [Auto House]." (R. 8-4, 22; 107 ¶ 8).

To obtain advances under the Loan Documents, Auto House submitted Floor Plan Requests to SAFS. (R. 8-4, 108 ¶ 11). Those Floor Plan Requests set forth,

2

among other things, a list of Vehicle Collateral to be acquired by Auto House and financed by SAFS, the amount to be paid by Auto House to acquire such Vehicle Collateral, and the total amount of financing that Auto House required from SAFS with respect to the acquisition of such Vehicle Collateral (the "Floor Plan Requests"). (*Id.*). In connection with each Floor Plan Request, SAFS required Auto House to submit copies of the following documents: (i) the bill of sale (or invoice) for Auto House's acquisition of the vehicle; (ii) the title to the vehicle; and (iii) a NADA Price Report (or similar document) for the vehicle. (R. 8-4, 108 ¶ 12). Davis oversaw and directed the preparation and the submission to SAFS of each Floor Plan Request. (R. 8-4, 145:22-146:1).

> ## C.   The Sham Floor Plan Requests and Invoices.

During the course of the parties' relationship and with Davis's knowledge, Auto House submitted Floor Plan Requests and bills of sale to SAFS for financing that listed vehicle purchase prices that were higher than the purchase prices reflected on the seller's bills of sale provided to Auto House in connection with the transaction pursuant to which Auto House acquired the vehicle. (R. 8-4, 152:3-11). To document the inflated purchase price presented to SAFS and to otherwise comply with the requirements for a Floor Plan Request, Auto House created a template false bill of sale. (R. 8-4, 150:3-11). Auto House then used that template to create false and inflated bills of sale for submission to SAFS. (*Id.*). The template

bills of sale stated an increased vehicle purchase price, but otherwise mirrored the actual bills of sale provided by the sellers. (R. 8-4, 149:10-24; 116-17 (reflecting Davis's deposition testimony in which he confirms that Auto House submitted false bills of sale)).[1] Submission of the inflated, forged template bills of sale allowed Auto House to obtain financing from SAFS in an amount greater than the actual transaction price would support. (*Id.*).

     **D.**    **The Sales Out of Trust.**

During the course of the lending relationship between Auto House and SAFS, and with Davis's knowledge and approval, Auto House sold Vehicle Collateral without notifying SAFS of the sale and without remitting the sales proceeds to SAFS as required by the Loan Documents. This practice commonly is referred to as a "sale out of trust." (R. 8-4, 108 ¶ 13; 229:12-24). To this day, neither Auto House nor Davis has paid SAFS for certain vehicles that Auto House sold out of trust. (R. 8-4, 108 ¶ 13; 187 ¶¶ 11-12). Furthermore, neither Auto

---

[1] While SAFS has a small number of documents related to these inflated Floor Plan Requests, all of which were obtained prior to (i) discovery of the scheme by which Auto House submitted the sham bills of sale to SAFS to secure inflated amounts of financing,  and (ii) the subsequent litigation with Davis, SAFS has been denied access to the Auto House business records that would allow for a full understanding and analysis of the misrepresentations made by Auto House and Davis to SAFS during their lending relationship. (R. 8-4, 188 ¶ 15). It is likely that Auto House submitted hundreds more forged and inflated bills of sale to SAFS, but evidence of these false bills of sale was destroyed along with the vast majority of Auto House's business records. (*Id.*).

House nor Davis has accounted for the disposition of the proceeds from the sales out of trust. (*Id.*). The outstanding floor plan balance due and owing to SAFS by Auto House and Davis on account of the Vehicle Collateral sold out of trust is $529,095.00. (R. 8-4, 187 ¶ 12).

  **E.**  **Davis's Participation in Auto House's Schemes.**

  In his role as Managing Member and sole owner of Auto House (R. 8-4, 106-7 ¶¶ 3-4), Davis supervised Auto House's employees, managed the day-to-day business operations, and oversaw Auto House's relationship with SAFS. (*Id.*; R. 8-4, 221:8-17; 226:1-4; 227:19-24). While providing constant oversight of and direction to Auto House's employees, Davis authorized John Frione and other Auto House employees to purchase vehicle inventory and to obtain financing from SAFS on Auto House's behalf for such vehicle inventory purchases. (R. 8-4, 145:18-146:19). At all times, Davis took an active role in Auto House's car buying and financing process. (*Id.*). He required that employees, including Mr. Frione, obtain his approval before making any vehicle purchase. (*Id.*). He also participated in the submission of inflated Floor Plan Requests to SAFS and the sales out of trust outlined above. (R. 8-4, 147:13-20; 154:7-13).

  Davis confirmed his involvement in Auto House's schemes in a voicemail

message that he left for John Sullo, the used car manager at Branhaven Motors,[2]

stating:

> Hey Johnny, it's George. Hey, uh, I got, I got problems. Southern Auto Auction is going to be, uh, comin' after some paperwork on cars that we bought from you, and I know that, uh, **my little friend Johnny[3] had, uh, changed some stuff, some invoices and this and that and, of course, I, I knew about it, and they're tryin' to get me in a lot of trouble**, I guess. But anyways, uh, could you please give me a call back, John? I really need you to call me back and please talk about it. Uh, you got my number. Thank you. I hope everybody's ok. Bye.

(R. 8-4, 119) (emphasis added). Davis also confirmed his involvement in the

scheme at his deposition:

> Q. And in that voice mail, you confirm that Mr. Frione was creating documents; is that correct?
>
> A. Yes.
>
> Q. And you confirm that you were aware of that at the time; is that correct?
>
> A. Yes.

(R. 8-4, 273:23-274:4).

### F.    Davis's Failure to Maintain Auto House's Business Records.

Shortly after Auto House ceased doing business in 2016, Auto House of

---

[2] Auto House regularly purchased vehicles from Branhaven Motors (a/k/a Branhaven Jeep Chrysler Dodge Ram). (R. 8-4, 228:9-13). The template bill of sale utilized by Auto House to present inflated Floor Plan Requests to SAFS was on a Branhaven Motors form. (*See, e.g.* R. 8-4, 278).

[3] "Little friend Johnny" is a reference to John Frione. (R. 8-4, 273:23-274:1).

Luxury, LLC ("Luxury") became the new tenant of the dealership premises on which Auto House had operated its business. (R. 8-4, 156 ¶ 5; 159 ¶ 4). Davis did not retain or attempt to retain Auto House's business records after the company ceased doing business, but left the records behind at the former Auto House dealership premises even after Luxury took over possession of the dealership premises. (R. 8-4, 222:10-25). Davis then returned to the dealership premises in September 2017 and retrieved Auto House's business records and files. (R. 8-4, 157 ¶ 8; 160 ¶ 7). Davis retained four to five boxes of bookkeeping records for the year 2016 for purposes of an IRS audit. (R. 8-4, 223:5-224:5). Otherwise, Davis allowed all of Auto House's business records to be destroyed, including the vast majority (if not all) of the documents related to the above-mentioned scam and the sales out of trust. (*Id.*). According to Davis, nothing prevented him from preserving the Auto House business records except the potential cost (if any) of moving the documents two miles away to his daughter's house. (R. 8-4, at 225:12-24).

G.     **The Connecticut Action.**

On or about October 4, 2016, after discovering the sales out of trust and the submission of false Floor Plan Requests by Auto House, SAFS filed a lawsuit in the Superior Court for the State of Connecticut against Auto House and Davis for breach of contract and breach of guaranty, respectively (the "Connecticut Action"). (R. 8-4, 109 ¶ 16). In 2017, SAFS amended the Complaint in the Connecticut

Action to include additional counts against Auto House and Davis and to add claims against additional parties. (R. 8-4, 109 ¶ 17).

In connection with the Connecticut Action, SAFS served document requests upon Davis and Auto House seeking, among other things, production of Auto House's business records. (R. 8-4, 109 ¶ 15). In response to the document request, Davis asserted his rights against self-incrimination under the Fifth Amendment to the United States Constitution, and neither Davis nor Auto House produced a single document. (R. 8-4, 187 ¶ 13; 213 (Connecticut court noting a "failure to produce Auto House's 2016 records")).

A jury trial was held in the Connecticut Action in 2018 wherein SAFS proceeded only on its claims against Davis and Mr. Frione—SAFS did not proceed against Auto House, and the jury made no findings with regard to any claims against Auto House. (R. 8-4, 79-101; 109 ¶¶ 19-20). Having asserted his right against self-incrimination under the Fifth Amendment to the United States Constitution, Davis did not testify at or even attend the trial in the Connecticut Action. (R. 8-4, 188 ¶ 14). Following the trial, the jury returned a verdict in favor of SAFS and against Davis on the breach of contract claim in the Connecticut Action and awarded SAFS damages in the amount of $918,080.80. (R. 8-4, 109 ¶ 20). However, the jury declined to award punitive damages to SAFS against Davis, finding that his conduct was not "outrageous" as is required to establish

8

entitlement to punitive damages under Connecticut law. (R. 8-4, 83). The Court in the Connecticut Action entered judgment in favor of SAFS and against Davis in the total amount of $1,324,327.49, virtually all of which remains unsatisfied. (R. 8-4, 110 ¶ 23).

     **H.**    **The Adversary Proceeding.**

Davis filed a voluntary Petition under Chapter 7 of the Bankruptcy Code on July 21, 2020. (R. 8-3, 1-57). In connection with Davis's bankruptcy case, SAFS filed the underlying Complaint on October 26, 2020, seeking a finding that Davis's debt to SAFS is nondischargeable based on: (1) knowing misrepresentations under 11 U.S.C. § 523(a)(2) related to the submission of false and inflated Floor Plan Requests to SAFS; (2) fraud or defalcation while acting in a fiduciary capacity, or by larceny or embezzlement under 11 U.S.C. § 523(a)(4); and (3) intent to cause harm under 11 U.S.C. §523(a)(6) related principally to the sales out of trust. (R. 8-3, 58-67). SAFS also objected to Davis's discharge on account of the following: (1) failure to maintain records under 11 U.S.C. §727(a)(3); (2) presentation of false statements in the Bankruptcy Petition under 11 U.S.C. § 727(a)(4); and (3) failure to explain loss of proceeds, assets, revenue, and/or collateral under 11 U.S.C. § 727(a)(5). (R. 8-3, 68-72). Finally, SAFS sought equitable relief in the form of dismissal of Davis's Bankruptcy Petition as an abusive or bad faith filing. (R. 8-3, 71).

### 1.   Davis's Motion for Summary Judgment.

Davis filed his Motion for Summary Judgment on February 12, 2021. (R. 8-4, 35-48). As is relevant to this Appeal, Davis argued that, while he did not dispute that Auto House sold SAFS's Vehicle Collateral out of trust, he was still entitled to summary judgment on SAFS's §523(a)(6) claim through the application of collateral estoppel. Specifically, Davis argued that SAFS is collaterally estopped from seeking a finding of nondischargeability under the "willful and malicious injury" standard of § 523(a)(6) because the Connecticut jury found that Davis's behavior was not "outrageous" in the context of a claim for punitive damages under Connecticut law. (R. 8-4, 44-45).

Davis also argued that he was entitled to summary judgment on SAFS's §727(a)(3) claim, based upon Davis's destruction of the Auto House business records, because Auto House ceased doing business in 2016 and its business records would not reflect Davis's financial condition. (R. 8-4, 45-46). Important here, Davis did not (and could not) argue that SAFS had full access to Auto House's business records at the time of or subsequent to SAFS's discovery of the falsified Floor Plan Requests and the sales out of trust. Davis also failed to present any evidence suggesting that his destruction of Auto House's records was justified.

### 2.   SAFS's Response to Davis's Motion for Summary Judgment.

SAFS filed its Response in Opposition to Defendant's Motion for Summary

Judgment ("Opposition") on June 25, 2021. (R. 8-4, 112-136). As is relevant to this appeal, SAFS made two arguments. First, SAFS argued that binding Eleventh Circuit authority holds that (i) sales out of trust satisfy the requirements for willful and malicious injury under § 523(a)(6), and (ii) a car dealership's sales out of trust could be imputed to its principal when the principal actively participated in the operation of the business. (R. 8-4, 126-29). Under that authority SAFS has a viable nondischargeability claim against Davis pursuant to § 523(a)(6), and the jury's findings in the Connecticut Action with regard to the punitive damage claims asserted against Davis have no bearing on such viability. (*Id.*). In opposing Davis's summary judgment motion, SAFS did not rely on Davis's conduct. (*Id.*) Rather, SAFS focused on record evidence, including Davis's own admissions, to establish that Auto House sold SAFS's Vehicle Collateral out of trust and that Auto House's "willful and malicious" injury could be imputed to Davis based on his active participation the management and operation of the Auto House business. (*Id.*). SAFS also argued that the legal standard for the award of punitive damages under Connecticut law and the requirements to establish nondischargeability under §523(a)(6) are not "completely identical" as is required for collateral estoppel to apply. (R. 8-4, 126-27).

SAFS also argued material issues of fact precluded summary judgment as to its §727(a)(3) claim. (R. 8-4, 129-132). Specifically, SAFS argued that: (1) ample

record evidence, including the affidavit of Garrison Hudkins, Vice President and Secretary of SAFS, and Davis's own admissions, confirmed that Davis failed to preserve Auto House's business records; and (2) binding Eleventh Circuit precedent established that those destroyed records would have shed light on Davis's financial condition—especially given that Davis personally guaranteed all of Auto House's debt to SAFS and was the sole owner and managing member of Auto House. (*Id.*).

### 3.      Davis's Reply in Further Support of Summary Judgment.

Davis filed his Reply In Support of Motion for Summary Judgment on July 16, 2021, repeating arguments already made in his initial Motion. (R. 8-5, 173-78).

### 4.      The Bankruptcy Court Ruling.

At a hearing held September 1, 2021, the Bankruptcy Court ruled from the bench by reading into the record its ruling granting Davis's Motion for Summary Judgment as to all counts. (*See* Hearing Transcript at ECF No. 9, hereinafter referred to as "Trans."). On SAFS's §523(a)(6) claim, the Bankruptcy Court found that the Connecticut jury's finding that Davis's conduct was not "outrageous" for purposes of awarding punitive damages under Connecticut law was "identical to [the §523(a)(6) analysis] under consideration here. Under the rules of collateral estoppel the jury's findings on the wrongfulness of the defendant's actions is binding in this case." (Trans. 33:2-6). The Bankruptcy Court provided no

110142512.8

substantive analysis regarding or comparison of Connecticut's punitive damages standard with the requirements for finding nondischargeability under §523(a)(6). (*See* Trans. pps. 32-33). In arriving at its decision, the Bankruptcy Court also ignored the binding Eleventh Circuit authority on which SAFS bases its claim under § 523(a)(6). (*Id.*).

The Bankruptcy Court also found that SAFS "had access to Autohaus' [*sic*] primary business records" during the Connecticut Action because, "when you read the Connecticut Courts orders that have been filed in this matter[,] it is clear that the trial included presentation of relevant business records. Thereafter the records were destroyed." (Trans. 35:2-14).[4] Based on these erroneous findings and without discussion or analysis of the factual record, the Bankruptcy Court made the conclusory statement that "there is no reason to believe that Autohaus' [*sic*] business records would provide any insight into the defendant's personal financial condition or his personal business transactions" and therefore granted summary judgment as to SAFS's §727(a)(3) claim. (Trans. 35:15-19). However, the

---

[4] As discussed in further detail below, the Bankruptcy Court did not address Garrison Hudkins's affidavit filed alongside the Opposition, which unequivocally states that SAFS did not have access to Auto House's business records during the Connecticut Action. In particular, neither Auto House nor Davis produced any documents during the Connecticut Action (or after) because Davis invoked his Fifth Amendment right against self-incrimination. (R. 8-4, 187-88 ¶¶ 13-15). The Bankruptcy Court also ignored Davis's own admission that he failed to maintain Auto House's business records. (R. 8-4, 251:24-252:1; 271:12-20).

Bankruptcy Court failed to identify a single fact in the record supporting this conclusion and entirely disregarded the fact that the Auto House business records could show the disposition of the proceeds of the sales out of trust – possibly to Davis – and the scope and scale of the false Floor Plan Requests.

The Bankruptcy Court entered the underlying Order Granting Defendant's Motion for Summary Judgment [R. 8-5, 198] and Final Judgment [R. 8-5, 199-200] on September 2, 2021, providing no further basis for its decision. This appeal followed.

## ARGUMENT

### I.     The Bankruptcy Court erred in applying collateral estoppel to bar SAFS's §523(a)(6) claim.

The Bankruptcy Court relied upon an application of collateral estoppel to grant Davis's Motion for Summary Judgment with respect to SAFS's §523(a)(6) claim. In doing so, the Bankruptcy Court found that: (1) the jury in the Connecticut Action found that SAFS was not entitled to punitive damages against Davis, and (2) "[t]he issue presented in the Connecticut case, meaning the wrongfulness of the defendant's actions with regard to the plaintiff is identical to that under consideration here." (Trans. 31:6-33:6). "In Connecticut, to be subject to collateral estoppel, an issue must have been (1) fully and fairly litigated, (2) actually decided, (3) necessary to the judgment in the first action, and (4) identical to the issue to be

decided in the second action."[5] *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 66 (D. Conn. 2014). "Because we have recognized that applying the doctrine of collateral estoppel has harsh consequences, namely, cutting off a party's right to future litigation on a given issue, we have been reluctant to uphold the invocation of the doctrine unless the issues are ***completely identical***." *Corcoran v. Dep't of Soc. Servs.*, 859 A.2d 533, 542 (Conn. 2004) (emphasis added). Given the focus by SAFS on the conduct of Auto House in connection with the sales out of trust, an issue never considered by the jury in the Connecticut Action, the required identity of issues is absent here.

It is impossible to square the Bankruptcy Court's decision to grant summary judgment in favor of Davis on SAFS's § 523(a)(6) claim with the Eleventh Circuit's decision in *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987) and other binding Eleventh Circuit authorities, all cited by SAFS in opposition to Davis's motion. Rather than address those authorities and conduct a fulsome analysis of SAFS's claim under those precedents, the Bankruptcy Court ignored those cases in favor of an irrelevant and incorrect application of the doctrine of collateral estoppel. Under *Owens* and related cases, the Bankruptcy Court should have denied summary judgment with regard to SAFS's § 523(a)(6)

---

[5] As the Bankruptcy Court determined, Connecticut law applies to the collateral estoppel analysis. *See In re Levin*, 434 B.R. 910, 917 (S.D. Fla. 2010).

claim, and this Court should reverse.

A debt is nondischargeable under 11 U.S.C. §523(a)(6) when it results from "willful and malicious injury by the debtor to another entity or to the property of another entity." "Proof of willfulness requires 'an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.'" *In re Wizenberg*, 849 F. App'x 775, 780 (11th Cir. 2021) (citation omitted).

In this Circuit, a sale out of trust constitutes a *per se* "willful and malicious" injury sufficient to establish a claim under §523(a)(6). *In re Monson*, 661 F. App'x 675, 684 (11th Cir. 2016) ("Bankruptcy courts within this Circuit have held that . . . where the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under §523(a)(6)."); *see Owens*, 807 F.2d at 1559 (debtor's company "caused a willful and malicious injury to [creditor] by the conversion of [creditor's] property" via sales out of trust imputed to debtor as officer of the company); *Westlake Flooring Co., LLC v. Staggs*, No. 5:17-CV-1722-KOB, 2018 WL 3752383, at *5 (N.D. Ala. Aug. 8, 2018) ("[T]he circumstances in which out-of-trust sales arise suffice to warrant a conclusion that the debt arose from a 'willful and malicious' injury") (quoting *Owens*, 807 F.2d at 1559). In this case, Davis admitted at his deposition that Auto House sold certain of SAFS's Vehicle Collateral out of trust, thus establishing a "willful and

16

malicious injury" under § 523(a)(6). (R. 8-4, 229:20-24).

*Owens*, cited by SAFS in its Opposition, is on all fours with the facts in this case and supports reversal of the Bankruptcy Court's decision to grant summary judgment in favor of Davis on the § 523(a)(6) claim. In *Owens*, defendant William B. Owens was the president, director, and majority stockholder of Dothan Lincoln-Mercury Company, Inc. ("DLM") and, in that capacity, executed a financing and security agreement with Ford pursuant to which Ford provided DLM with floor plan financing for the acquisition of vehicle inventory. *Owens*, 807 F.2d at 1557. Owens also signed a personal guarantee of DLM's obligations to Ford under the financing and security agreement. *Id.* During the parties' lending relationship, DLM sold vehicles subject to the financing and security agreement without remitting the proceeds to or otherwise informing Ford (i.e. sales out of trust). *Id.*

Based on the sales out of trust, Ford filed an adversary proceeding in Owens's bankruptcy case seeking to render Owens's debt to Ford nondischargeable under, in addition to other provisions, §523(a)(6). *Id.* The bankruptcy court rejected Ford's arguments, finding that: (1) the sales out of trust did not constitute a "willful and malicious" injury under §523(a)(6), and (2) Owens could not be found personally liable for the actions of DLM. *Id.* at 1557-58. The District Court reversed. *Id.* at 1559.

17

On appeal, the Eleventh Circuit agreed with the District Court, finding that under §523(a)(6), DLM's actions barred Owens from receiving a discharge of the Ford claim in his personal bankruptcy based on Owens' actions in operating and managing the DLM business. According to the Eleventh Circuit:

> The evidence established that Dothan Lincoln-Mercury disposed of a number of vehicles, their value totaling $97,000, without accounting for the proceeds to FMCC in contravention of the expressed trust provisions of the floor plan. We affirm the district court's findings that when Dothan Lincoln-Mercury disposed of said proceeds it did not have any good faith reason for doing so and that it presumptively knew that harm would result from conversion of a secured party's collateral. The district court properly ruled that Dothan Lincoln-Mercury was guilty of a willful and malicious conversion of FMCC's property.
>
> ***
>
> The district court's ruling that Owens had actively participated in the conversion because he made the decision to dispose of the automobiles and not to turn over the proceeds to FMCC is clearly supported by the evidence in the record. In so finding, the district court correctly held that Owens was not entitled to a discharge in his personal bankruptcy because of his actions as a majority stockholder and president of Dothan Lincoln-Mercury, whereby he failed to comply with the essential terms of the floor plan.

*Id.* at 1559-60.

As was the case in *Owens*, there is no question here that Auto House "caused a willful and malicious injury to [SAFS] by the conversion of [SAFS's] property." *Id.* at 1559. To support summary judgment, Davis had to establish that there were no facts on which the Court could conclude that Davis participated in the decision to sell vehicles out of trust. Davis not only failed to produce such proof, the record

18

supports the opposition conclusion.[6]  As Davis presented no evidence to suggest he did not participate in and acquiesce to Auto House's sales out of trust, the Bankruptcy Court was left to decide a disputed issue of fact as to whether his participation in the sales out of trust justified imputation under §523(a)(6). *Id.*; *see In re Forbes*, 186 B.R. 764, 768 (S.D. Fla. 1995) ("It is undisputed that [debtor] was in direct control of the operations of each of the Corporations. [Debtor] is therefore personally liable for the Corporations' unauthorized actions with respect to the [collateral]."). On the record before the Bankruptcy Court, it had no option but to deny summary judgment in light of the Eleventh Circuit's analysis in *Owens*.

Rather than address the imputation argument asserted by SAFS and mandated by *Owens*, the Bankruptcy Court ignored the issue and focused on a misguided collateral estoppel argument advanced by Davis. The collateral estoppel argument put forth by Davis examines the findings of the Connecticut jury on SAFS's claim for punitive damages under Connecticut law – specifically whether Davis's conduct was "outrageous."  While that finding concerned the actions of

---

[6] SAFS's Opposition provided ample evidence showing that Davis, as the Managing Member of the company, knew everything that took place at Auto House and actively participated in the sales out of trust. (R. 8-4, 147:13-20 (stating that Davis knew "everything and anything that was kind of going on"); 226:2-4 ("Q Did you have final say on all business decisions? A I would like to think I did."); 185 ¶ 5)).

19

Davis, the imputation argument presented by SAFS required the Court to focus on the conduct of Auto House – the sales out of trust – rather than Davis's conduct as an individual. As noted above, the jury in the Connecticut Action never considered any claims against Auto House. (R. 8-4, 79-101; 109 ¶¶ 19-20). Because the jury in the Connecticut Action did not consider whether Auto House caused a "willful and malicious injury," its findings cannot support application of collateral estoppel to preclude SAFS's § 523(a)(6) claim premised on the imputation of Auto House's conduct to Davis under controlling Eleventh Circuit authorities.

Since SAFS's § 523(a)(6) argument focuses on Auto House's actions in selling the Vehicle Collateral out of trust, and the Connecticut jury considered whether Davis's actions, in his individual capacity, were "outrageous," the issues are not "identical."  For this reason, the Bankruptcy Court erred when it relied on collateral estoppel to grant summary judgment in favor of Davis on the § 523(a)(6) claim. *Gladysz v. Planning & Zoning Commission*, 773 A.2d 300 (Conn. 2001) ("[C]ollateral estoppel has no application in the absence of an identical issue.").

## II.     The Bankruptcy Court erred in granting summary judgment as to SAFS's §727(a)(3) claim based on findings contradicted by the record.

"Objections to discharge under §727(a)(3) are not usually decided on summary judgment, as they normally require a fact intensive inquiry regarding the adequacy of the defendant's records." *In re Bianca*, No. 19-16935, 2020 WL 1181362, at *2 (S.D. Fla. Mar. 10, 2020) (citation omitted). Under §727(a)(3), the

110142512.8

court should deny a debtor discharge when:

> "[T]he debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. §727(a)(3). Subsection (a)(3) does not contain a fraudulent intent requirement.

*In re Protos*, 322 F. App'x 930, 935 (11th Cir. 2009). "The purpose of [§727(a)(3)] is to ensure that creditors and the trustee are given enough information to understand the debtor's financial condition." *In re Askins*, No. 8:18-BK-08833-RCT, 2020 WL 5745648, at *4 (M.D. Fla. July 24, 2020). While "[e]ach case is decided on its own facts," debtors like Davis, "who [are] involved in business[,] may be subject to a more stringent standard than a debtor who is an unsophisticated wage earner." *In re Moore*, 559 B.R. 243, 254 (M.D. Fla. 2016).

In his Motion, Davis argued that he was entitled to summary judgment on SAFS's §727(a)(3) claim because: (1) Auto House had been closed for over four years; and (2) Auto House's business records would have no bearing on his own financial condition. (R. 8-4, 45-46). Important here, Davis did not assert that SAFS had access to any Auto House business records at any time after SAFS discovery that Auto House had presented SAFS with falsified Floor Plan Requests and that Auto House had sold SAFS's Vehicle Collateral out of trust. (*Id.*) Moreover, Davis did not argue that either he or Auto House ever produced any of Auto House's

21

business records to SAFS either during the pendency or after the conclusion of the Connecticut Action. (*Id.*) He also failed to present any evidence suggesting that the destruction of those records was justified. (*Id.*)

In its Opposition, SAFS relied on the affidavits of Muamet Iljazi and Armend Iljazi[7] to establish that: (i) Davis did not initially retain Auto House's business records after the company ceased doing business in 2016; and (ii) Davis later retrieved the Auto House business records in September 2017. (R. 8-4, 156-160). SAFS also established through Davis's deposition testimony that Davis retained four to five boxes of bookkeeping records for purposes of an IRS audit and that he allowed the destruction of the remainder of Auto House's business records— including the vast majority (if not all) of the documents related to Auto House's scam and the sales out of trust. (R. 8-4, 223:5-224:5).

SAFS also presented the affidavit of Garrison Hudkins to establish that neither Davis nor Auto House produced a single document in the Connecticut Action. To avoid producing the records, Davis asserted "his rights against self-incrimination under the Fifth Amended to the United States Constitution…." (R. 8-4, 187 ¶ 13). As further evidence of this fact, SAFS presented an Order from the Connecticut Action precluding Davis from introducing documents at trial and

---

[7] The Iljazis are members of Auto House of Luxury, LLC, the company that took over the building out of which Auto House operated before it shut down.

reserving the ability for an adverse inference based on Davis's refusal to produce any of Auto House's business records. (R. 8-4, 213).

Finally, SAFS established that, because the destroyed Auto House business records are essential to understanding the extent of Davis's schemes and how those schemes enriched Davis personally and harmed SAFS, there is no question the business records would shed light on Davis's financial condition—especially in light of his personal guarantee of Auto House's obligations. (R. 8-4, 251:24-252:1) ("Q And we don't have the business records to verify [the vehicle's chain of title]; is that correct? A Correct."); 271:12-20 ("Q Do you have evidence of the way in which the internal invoices or internal bills of sale created by Auto House of Southington tie out to the actual invoices received from Branhaven? A No, I don't. Q That would be contained in the business records that were destroyed; is that correct? A If they kept records at that level, yeah."); (R. 8-4, 188 ¶ 15) ("[W]ithout the Auto House business records, SAFS is unable to present documentary evidence that Auto House submitted inflated template bills of sale for each of the 103 vehicles on which SAFS advanced floor plan financing in an amount greater than the amount of the purchase price reflected on the Branhaven bill of sale.").

Relying on this evidence, and in response to Davis's argument that Auto House's business records would not reflect on his personal financial condition, SAFS directed the Bankruptcy Court to the Eleventh Circuit's analysis in *In re*

23

*Lorenzo*, 606 F. App'x 548 (11th Cir. 2015) where the court held under nearly

identical circumstances that §727(a)(3) applies to a debtor's destruction of their

company's business records, stating:

> In this case, Lorenzo admittedly destroyed a computer server that held
> some of Air Carrier's financial records, mysteriously lost several other
> computers containing other records, and indiscriminately shredded
> most of the closely held company's paper records. The records she
> destroyed and lost detailed Air Carrier's finances, including payments
> Lorenzo made using Air Carrier's money to cover her personal
> expenses. **Those missing and destroyed records would have shed
> light on *her* financial condition.** *See* 11 U.S.C. §727(a)(3).
> Regardless of whether the records might also be applicable "in
> connection with another case ... concerning" her closely held
> company, *see id.* § 727(a)(7), they were records "from which
> [Lorenzo's] financial condition or business transactions might be
> ascertained," *see id.* §727(a)(3). The bankruptcy court applied the
> correct provision.

606 F. App'x at 552 (emphasis added); *see also In re Moore*, 559 B.R. 243, 255

(M.D. Fla. 2016) ("When a debtor destroys, conceals, or falsifies books of a

corporation that are necessary to the understanding of the debtor's financial

condition and business transactions, a discharge should be denied.").

Like the debtor in *Lorenzo*, Davis allowed or caused the destruction of key

Auto House business records. The documents Davis destroyed or allowed to be

destroyed included business records "from which [Davis's] financial condition or

business transactions might be ascertained." *Lorenzo*, 606 F. App'x at 553. At a

minimum, genuine issues of material fact exist as to whether those records would

shed light on Davis's financial condition and whether his destruction of those records was justified.

Despite the strong record, and without addressing *Lorenzo* or the other authority cited by SAFS, the Bankruptcy Court granted summary judgment based on the erroneous finding that SAFS had access to Auto House's business records during the pendency of the Connecticut Action.[8]  Specifically, the Bankruptcy Court stated:

> Autohaus [*sic*] ceased business more than four years prior to the filing of this case. This was followed by substantial litigation by the plaintiff against both Autohaus [*sic*] and the defendant, **during which time the plaintiff had access to Autohaus [*sic*] primary business records**.
>
> **The plaintiff obtained a judgment against Autohaus [*sic*] and the defendant based apparently on those very business records**. Indeed, when you read the Connecticut Court's orders that have been filed in this matter it is clear that the trial included presentation of relevant business records. Thereafter the records were destroyed.
>
> Given this history, for purposes of this bankruptcy case, there is no reason to believe that Autohaus's [*sic*] business records would provide any insight into the defendant's personal financial condition or his personal business transactions. Given this history it is reasonable that the defendant does not now have possession of Autohaus' [*sic*] business records.

(Trans. 35:2-21) (emphasis added). The Bankruptcy Court's findings are directly

---

[8] The Bankruptcy Court also mistakenly found that SAFS obtained a judgment against Auto House in connection with the Connecticut Action. In fact, SAFS did not proceed against Auto House at the trial in the Connecticut Action. (R. 8-4, 79-101; 109 ¶¶ 19-20).

contradicted by record evidence.[9]

As a preliminary matter, Davis did not (and could not) move for summary judgment on the basis that he or Auto House produced any business records during the Connecticut Action. The record is clear that Davis asserted his right against self-incrimination under the Fifth Amendment of the United States Constitution and that he and Auto House produced no documents during the Connecticut Action. (R. 8-4, 108 ¶ 13; 213 (Connecticut court noting a "failure to produce Auto House's 2016 records")). Davis also failed to provide any evidence on which the Bankruptcy Court could determine that he was justified in destroying the Auto House business records. *See* 11 U.S.C. §727(a)(3) (precluding discharge "unless such act or failure to act was justified under all of the circumstances of the case"); *In re Bianca*, No. 19-16935, 2020 WL 1181362, at *3 (S.D. Fla. Mar. 10, 2020) ("[T]he moving party 'always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

While the Bankruptcy Court apparently read orders entered in the

---

[9] Having disregarded contradictory evidence in the record, the Bankruptcy Court clearly failed to "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).

26

Connecticut Action to mean, "that the trial included presentation of [Auto House's] relevant business records," its interpretation is belied by the record.[10] As noted by Mr. Hudkins in his affidavit, SAFS never had access to Auto House's business records. (R. 8-4, 188, ¶ 15). SAFS was only able to present evidence at trial regarding Auto House's scheme through limited records obtained in the ordinary course of business prior to its discovery of the false Floor Plan Requests and the sales out of trust and through third-party discovery during the Connecticut Action. (*Id.*; R. 8-5:75-172). Neither Auto House nor Davis produced these limited records.

Moreover, the third party records reveal only one side of each transaction. Without a complete set of records, SAFS is unable to decipher the full extent of Auto House's scheme, the amount of money stolen, or where the stolen money ended up. (R. 8-4, 188, ¶ 15). Accordingly, despite the Bankruptcy Court's finding to the contrary, the record was clear that: (1) Davis did not produce, and SAFS never had access to, the vast majority of Auto House's business records, and (2) those records would directly reflect on Davis's financial condition.

As noted above, the law is clear that §727(a)(3) claims are not suitable for

---

[10] While the transcript is unclear as to which order(s) the Bankruptcy Court is referring, it appears that the Bankruptcy Court is focused on the Connecticut Court's Ruling on Plaintiff's Motion to Reform Verdict, where the Connecticut Court stated that "SAFS introduced evidence of approximately 22 vehicles as to which Auto House had produced a false bill of sale." (R. 8-4, 89). This is a small fraction of the 103 financing transactions referenced by Mr. Hudkins in his affidavit. (R. 8-4, 188 ¶ 15).

summary judgment "as they normally require a fact intensive inquiry regarding the adequacy of the defendant's records." *In re Bianca*, 2020 WL 1181362, at *2. Here, the Bankruptcy Court not only failed to conduct the requisite "fact intensive inquiry regarding the adequacy" of Davis's records or to consider whether Davis's destruction of Auto House's records was justified, but also found an absence of disputed material facts based on an unsupported narrative directly contradicted by the record evidence. For these reasons, the Court should reverse the Bankruptcy Court's grant of summary judgment in favor of Davis on SAFS's claim pursuant to 11 U.S.C. § 727(a)(3).

## **CONCLUSION**

In opposing Davis's Motion for Summary Judgment, SAFS presented tangible record evidence and binding Eleventh Circuit precedent establishing that, at a minimum, material issues of genuine fact existed as to its §523(a)(6) and §727(a)(3) claims. The Bankruptcy Court not only failed to address SAFS's evidence and law, but rewrote the §523(a)(6) claim to improperly apply collateral estoppel to non-identical issues, and, in determining SAFS's claim under §727(a)(3), fashioned an unsubstantiated narrative contradicted by record evidence to mistakenly find that SAFS had access to Auto House's records during the Connecticut Action.

Accordingly, because these erroneous findings form the basis of the Order

110142512.8

and Final Judgment, Appellant, SAFS, Inc., respectfully requests that the Court

reverse the Order and Final Judgment and remand this matter to the Bankruptcy

Court for further proceedings.


Dated:  November 15, 2021                    Respectfully submitted,

                                        By:  */s/ Andrew R. Ingalls*

                                             **DAY PITNEY LLP**

                                             Joshua W. Cohen
                                             Admitted *Pro Hac Vice*
                                             jwcohen@daypitney.com
                                             195 Church Street – 15th Floor
                                             New Haven, CT 06510
                                             jwcohen@daypitney.com
                                             Tel: (203) 752-5000 / Fax: (203) 399-
                                             5854

                                             Andrew R. Ingalls
                                             Florida Bar No. 112558
                                             aingalls@daypitney.com
                                             brodridguez@daypitney.com
                                             396 Alhambra Circle
                                             North Tower – 14th Floor
                                             Miami, Florida  33134
                                             Tel: (305) 373-4000 / Fax: (305) 373-4099
                                             *Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of November, 2021, a true and correct copy of the foregoing document was electronically filed using the CM/ECF system and served via Notice of Electronic filing on all parties with counsel registered on CM/ECF, including Les Osborne, Esq., Rappaport, Osborne & Rappaport, PLLC, Squires Building, 1300 North Federal Highway, Suite 203, Boca Raton, FL 33432, les@rorlawfirm.com, *Counsel for Defendant*.

                                        */s/ Andrew R. Ingalls*
                                        Andrew R. Ingalls


## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations in Fed. R. Bank. P. 8015(a)(7)(B) because it contains 6,982 words.

                                        */s/ Andrew R. Ingalls*
                                        Andrew R. Ingalls

110142512.8